Case numbers 15-2031 and 15-2183, Kellogg Company v. National Labor Relations Board. Oral argument not to exceed 15 minutes per side. Mr. David Boudet for the petitioner cross-respondent. May it please the court, David Boudet with the law firm of Miller Johnson. We represent the Kellogg Company. I have reserved two minutes for rebuttal. This case at its core is a simple, straightforward contract interpretation case. The board found the lockout here to be unlawful based solely on a contract modification theory. Everyone agrees that absent a finding of a modification, the lockout is lawful. Because the foundation of the board's order rests entirely on interpretation of a contract, its conclusions are not entitled to any deference. This court reviews interpretations of contracts to no vote. To have this order enforced, the board must establish that the last best offer, this document, directly conflicts with the specific and exact language in this document. But everyone knows that's not true. There is not a direct conflict in these two documents. There isn't a direct modification. And because of that, simple reason, the general counsel theory fails and the board's order should not be enforced. Well, the reason the so-called rule, I guess it's fair to call it a rule, exists that if you're renegotiating an agreement such as the Memphis Agreement, then it is problematic to, it's problematic when that has implications for the master agreement or it's not problematic. The source of determining that is really board precedent, right? No, it is not. In this case, the board's decision rests on its interpretation of the master agreement. And the master agreement as a contract sets forth the bargaining rights of the parties and where things must be bargained. Here's what I'm really asking. If Memphis Agreement, the proposed Memphis Agreement modification, implicitly violated the master agreement, although it did not, perhaps it was not explicit, the source of the rules concerning that, I mean, certainly standard contract interpretation has something to do with that. But the major source of the rules concerning that derives from the board's own precedent, Milwaukee Spring in those cases. Your Honor, I agree that Milwaukee Spring has direct application that the board can't run away from here. But I think in this case, there's a whole other layer of contractual protection here, not protection is the wrong word, but the contract that must be interpreted here. Section 101, the parties, when they set up the master agreement in 1969, they were careful to delineate where things must be bargained. Under Section 101 of the master agreement, the title is scope of the agreement. And in that, if you read Section 101, what they make clear is, if something is bargained in the master agreement, it must be specifically included. And only things that are specifically included go in the master bucket. Everything else, as a matter of law and a matter of contract, must be bargained in the local bucket. And so as a matter of contract, in addition to Milwaukee Springs, when you layer that on top of it, I think it makes this an easy case. Can I ask one more question, which is not strictly necessary to the decision, and then I'm going to shut up? What happened during the renegotiation of the master agreement, which would have expired in 2015, I think? The parties reached an agreement, Your Honor. Okay. Do you want any more detail on that? Not really. I mean, does it incorporate the provisions that were, I mean, does it alter in any way the delineation between what was reserved for the local agreement and what was reserved for the master agreement under your theory? Section 101 remains unchanged, Your Honor. Okay. Thank you. Back up a little bit here. In general, what happened here? Kellogg proposed to expand the use of its second tier of bargaining unit or union production employees at Memphis in an effort to save the plant and add jobs. Kellogg had had a long history bargaining in second tier union employee jobs at its other facilities. And the other facilities had used them to a greater extent, giving them an economic advantage over the Memphis facility. During the 2013 Memphis negotiations, the union, it's fair to say, didn't like it. They thought it was a bad deal. And when unions think that it was a bad deal, what they should do is bargain. They should make proposals. Thirteen bargaining sessions, zero written proposals by the union. Faced with this impasse, Kellogg utilized the economic weapon of a lockout in an attempt to move the parties towards an agreement. The union didn't have any proposals at all or didn't say anything at these meetings? They did say some things, Your Honor. They did not offer any written proposals or counterproposals. They did speak in the record. They said they would take that. That's correct. They actually refused it. Correct. They walked away from the table at the end and said, we're done and we're done forever. That was the last thing said at the table, Your Honor. And so what the union did instead is it ran off in search of a legal theory and hoped the government would intervene. Five months after the charges are filed, we end up with this theory that's in front of the court. And it's a contract modification theory. And this theory must fail for two simple and irrefutable reasons. As I stated earlier, Kellogg's proposals do not directly conflict with an explicit term of the master, with an express term. And because it doesn't do that, both as a matter of law, Milwaukee Springs, and as a matter of contract, Section 1.1 of the master, the board's theory fails. And the board's theory can't be saved here by creating implied terms because under both the master and under the law, implication does not equal modification. The master explicitly does not permit modification by implication. And even if it did, Milwaukee Springs teaches that in order to have 8D modification, there must be a direct conflict. You can't do it by implication. And then you have the waiver standard that says when the party has a statutory right to bargain, and all the terms in Kellogg's last best offer, that's the proposal at issue, cover mandatory topics of bargaining. In order for that statutory right of Kellogg to be waived, it can't be by implication. It's got to be by clear and unmistakable terms. Did the board say why it did not follow Milwaukee Springs? Did it distinguish it, or what did it do with it? Complete silence, Your Honor. It ignored it despite the fact in the 10J appeal up here in front of the court, the general counsel has asked specific questions about Milwaukee Springs. They represent the board. The board issued a decision about a month later. Didn't address it. We filed a motion for reconsideration where we, again, put Milwaukee Springs squarely in front of them, and also included the transcript from the oral argument here in front of the Sixth Circuit, and complete silence on the topic, Your Honor. Did it even mention it in its decision? Silence. Complete absence of it. And there's a real danger here in enforcing the board's order, Your Honor. First, enforcing the board order here incentivizes litigation over negotiation. It does significant violence to the core purpose of the act, which is to promote collective bargaining. Look at the board's order in this case. It creates confusion, uncertainty. After three years of litigation, what have the parties learned? You can bargain about casuals at the local level to some point, to some degree. There's a core workforce term. I don't know where that comes from. Don't know what it means. General counsel, in questioning from this court, represented that it was okay for Kellogg to bargain to increase the cap from 30% to 40% on the utilization of casuals, but was uncertain as to whether it could go to 40% or 50% or 60% or where the line may be. And the reason that the general counsel floundered with that answer is because the master agreement does not contain any work preservation terms. Zero. Because if it had, the general counsel could have easily answered that question. Yet the board's decision requires that there be a direct modification of some type of an express work preservation term in the master. And that's one of the primary reasons this board theory fails, because there can be no direct modification. Undeniably in the master, the board doesn't dispute this. There is no express work preservation term. The board's decision is interesting in this respect because it's in conflict with itself. The master says explicitly what with regard to the casual employees. It says what they will be paid in relationship to the regular employee. It says it will be paid $6 less. It says, correct me if I'm wrong here, it says that there can be such employees. It does not. It actually says in the master under Section 101D, I think it is, it states that the definition of employees will be determined in the supplemental agreements. And the only reference to the word casual is in the wage appendix, and it states that it will be paid $6 less per hour than the regular employee. That's it. There's no other reference to the word casual in the entire master agreement. So what does the board, I'm sorry. Do the other locations of Kellogg's plants have casual employees? Yes, sir. The other plants have had them for a long time. They've been in existence since 1981. For example, the Battle Creek plant, which is what the language of the Memphis agreement is modeled after, they use them extensively. In 2013, they used 86,000 hours worth of casuals. And casuals work side by side with regular, doing the exact same work in the exact same facilities. Don't get paid as much or have the benefits. It would have been $23 an hour, Your Honor, in Memphis, as opposed to $29. That would have been the difference. And Kellogg was willing to bargain benefits with the union, but the union would not bargain. For informational purposes, does any other of the local agreements have this total elimination of a limit on the number of casuals? From 1981 to, I think, the early 90s, the Lancaster-Memphis local agreement did not have a cap. And then they negotiated a 20% cap, and I think now they're at 40, and I may have that backwards, Your Honor. But they do all have. Now, but they didn't always. When it was first bargained in, there was absolutely no cap. And those caps were bargained at the local level. And you can see the internal conflict in the board's decision trying to grapple with this issue. Well, there's no work preservation term. There's no cap. And they find in one sentence, they state as they must, that the master agreement does not provide any job, any guarantee of hours, of minimum hours for regular employees. No work preservation. Two sentences later. But they find from the party's intent this core workforce term. A core workforce, by definition, inherent in that is some guarantee of hours. Decisions in conflict with itself. Well, the argument's more general than that and more indirect. I mean, the argument, as I understand it, and I'm sure your adversary will tell me if I don't understand it, is that by eliminating any cap, the proposed local agreement would have effectively modified the implied dichotomy in the master agreement of a distinction between the regular workforce and casual and non-regular employees. If I can respond to that. First, the only distinction. Do you think I got the argument? I think you got the argument. The only distinction required in the master between regulars and non-regulars is $6 per hour. That's preserved in the last best offer. The idea that something is implied and creates a term in the master, not only does it run afoul of the master's language, it runs afoul of what the Supreme Court has said. The Supreme Court has said you can't impose terms. It derives from the ordinary usage of the word casual. But that is not the basis of the board's decision, nor has it ever been the basis of the board's. . . That's the way I can understand the argument, is that the master agreement contemplates that there's going to be a regular workforce and the casual employees will be something else, having the normal name applied to a casual employee, because that does have some meaning, ordinary meaning. Your Honor, that's, again, the board's decision is clear. Quote, We find the proposals would have modified the wage, benefit, overtime, and premium pay provisions applicable to new and returning regular employees. Quote from the General Counsel in representation of this Court, The Regional Director has never asserted that Kellogg's proposals would modify the master agreement provision regarding casual employees. Second, the General Counsel admits that they can bargain over casual employees at the local level, says they can do that. Third, the definitional terms of casuals in this instance are included in the Memphis Agreement under Section 107. That agreement is open. We can all agree when the contract is open, the parties can propose. Remember, that's what it was. They were proposing a change. They were proposing a change to the restrictions, a change to the definition, and that is absolutely appropriate. And fourth, the parties pass practice. If you want to reserve your two minutes, your slide is gone for some time. Can I make one final point? Answer the question. Sorry? Okay, thank you. Good morning. May it please the Court. Joel Heller from the National Labor Relations Board. The NLRA holds parties to their promises. Yet rather than honor its contractual obligation to its employees in Memphis So where is the promise that they have breached? The promise is that the Master Agreement distinguishes between regular employees and casual employees. But if the Master Agreement doesn't specify how many of each there must be or can be, how would you ever get to that if that can't be a subject of bargaining? Because what Kellogg was doing here was essentially a wage and benefit cut for regular employees. And they can do that, they just have to do it at the correct time. They can do it directly during Master Agreement negotiations rather than indirectly in this roundabout way during supplemental agreement negotiations. What the Master Agreement provides for in several places is the terms and conditions for regular employees. Does it give some kind of a quota for each one in the Master Agreement? That is, 50% have to be regulars and 50% can be casual or anything like that? There is not a provision that sets forth a particular amount or particular type of work for regular employees. So how would you get to that? The problem with Kellogg's proposal, why it's a modification of the Master Agreement, is that it creates the entire complement of new hires would be labeled casual employees. It would create this permanent, full-time workforce that is regular in all but name, but receives different terms and conditions of employment than are set forth for such employees in the Master Agreement. But if there aren't any specific limits on how many of each kind of employee you can have or under what terms can you employ new employees, how is what Kellogg wanted to do contrary to what's in the Master? Because the result of Kellogg's proposal is that all new hires would be labeled casual employees. There would be no restrictions on how many and what they can do. Maybe no. I mean the proposal didn't mandate that. It gave them the right to do so. That would certainly be the expectation. Kellogg stated. That if you would bargain and obtain that kind of benefit, you sure wouldn't be bringing on new people and labeling them regular. Right, and Kellogg made clear during negotiations that that was its intent, to bring in only casual employees.  They can now be used under Kellogg's proposal when you can hire a new casual employee when a regular employee is on temporary layoff. That's a change. You can bring back regular employees as casual employees. Now, was that the practice that was going on before they started this bargaining, or what was part of the bargaining? Prior to that, Kellogg was prohibited from bringing on new casual employees if a regular employee was on layoff. Okay, so they couldn't bring in a casual to replace one that was regular. They just had to bring in another regular. Correct, or offer the layoff. Or not bring in anybody. Or offer the layoff regular. And where is that prohibition found? That prohibition is in the supplemental agreement. Well, then it must have been bargained for. It was bargained for at some point. Yes, I'm not sure when that provision came in. I don't know if that's the subject of bargaining, and the master doesn't explicitly address it. Why is this? I don't understand. It's the confluence of all of Kellogg's changes here. This is an extreme proposal. And it's when you, Kellogg's proposal. Did you bargain with them with regard to it? Did the union bargain with Kellogg as to what? As to what you're now calling an extreme proposal. The union did not provide any counterproposals. So you did not bargain. They are privileged to refuse under Section 8D of the NLRA. There was bargain. There was not a counterproposal from the offer. They certainly met many times. But Section 8D of the NLRA says that a party, the recipient of a proposal that would modify a contract midterm does not have to agree to it, does not have to discuss it. So there is no right to bargain over a midterm modification, and the recipient can simply refuse to do so. You say that the company couldn't do it at all. They couldn't even bargain or have a talk with the union. They could talk about it. They could not insist upon the proposal to the point of impasse, and they cannot lock out the employees. Until the master agreement came up, if you're saying that. Correct. Once the master agreement has expired, the parties can discuss and can bargain and can insist on to impasse, can lock out and strike the terms and conditions for regular employees. And that is what Kellogg was attempting to do here. He was attempting to make that change by eliminating any distinction between regular and casual employees. After Kellogg's proposal, these two types of employees would be indistinguishable except for the wages and benefits level. And so what happens is we have this group of employees that do all the work of regular employees. There's no restriction on them. They're indistinguishable from regular employees, but they receive different terms and conditions of employment. They don't get as good a deal. They don't get as good a deal. They get paid less and they don't get the benefits, right? Well, that's certainly true, but the question before the court is not whether this is a good or a fair proposal, whether it's an economically necessary proposal for the plant. The question before the court is whether Kellogg could insist upon this proposal at the time that it did so. The wage rate is set by the master agreement wage appendix. The wage differential is the $6 wage differential is set by the master agreement. Also, the cost of living adjustments. If Kellogg decided that it wanted to pay the casual employees more than that wage differential sets, would that be something that they wouldn't have any right to do or couldn't even bargain over? If they wanted to pay the casual employees more than the $6 less, that would modify the master agreement, and so it was not something that the parties could insist upon. It's something they can discuss. They can negotiate on it, but they can't have a lockout is what you're saying. Yes. The parties can agree to midterm modifications. They just, one side cannot insist upon it to the point of impact. Where does $29 an hour come from? Where does $29 an hour come from? I believe that Mr. Budett's reference is that that is what at least some regular employees are paying. Well, I'm looking at both agreements, and I'm not seeing anything in either of them that explicitly tells me that, so I assume it has something to do with a rate previously determined, and we have provisions that relate to that but that don't directly explain how we got there in the first place. I mean, how do we know that $29 is the regular pay, that 23 would be the casual rate? So the specific wage rates for the different job classifications, and by job classifications I don't mean regular versus casual, I mean mechanic, engineer. Yeah, I got it. Those are set forth at the supplemental level where those particular classifications exist. What's in the master agreement is these across-the-board policies, such as the wage differential, such as the benefits that are set forth for regular employees in Section 6.01, which these new relabeled casual employees would not receive, such as the overtime and premium pay provisions, which are in Section 5.04, which are different for these new relabeled casual employees. But the differential is established in the appendix to the master agreement. Yes, Your Honor, it's in the wage agreement. But not the effective job right for workers of a particular classification. Right, because that is dependent on which classifications are present at which plant, because this master agreement covers all four plants. So that's why it sets these across-the-board policies. And that has been the past practice. Changes to across-the-board issues are negotiated at the master agreement level. For example, the wage progression schedule, it sets out how many years it takes for an employee to get to the full rate. That used to be three years, now it's four years. That was negotiated at the master level. And that is something that these newly hired so-called casual employees would not receive. How does Milwaukee Spring impact your argument? Okay, so Milwaukee Spring is not the kind of watershed case that Kellogg makes it out to be. Milwaukee Spring is a midterm modification case, but it doesn't set out the legal standard. That is in Section 8D of the Act itself. Milwaukee Spring, the difference between that case and this one, is that in Milwaukee Spring the employer moved one department from a unionized facility to a non-unionized facility that was covered by a different contract. Here we have these new hires, these relabeled casual employees. They're still subject to the master agreement, but they do not receive the terms and conditions set forth therein. So the more apt analogy is to Stroman Bakeries cited in our brief, which is where an employer hired new employees under the same contract to do the same work, yet called them something different and paid them less. Isn't it a problem not for the board not to discuss its precedent? The reason I was asking Mr. Bidet early on about the source of the rules for contracts and labor law and the relationship between the master agreement and the local one is that it's to some degree a matter of contract interpretation, but it's also a matter of NLRB precedent as to how these two kinds of agreements are to be interpreted in relation to each other, right? Yes, Your Honor. And isn't there a requirement that if the board departs from its precedent, it must explain it in order for us to review it under the typical standard, more deferential standard? Yes, as a general matter, and as a general matter, yes. The reason the board did not discuss, I imagine the board did not discuss Milwaukee Spring here, is for the reason I stated. It doesn't set forth kind of a new rule of decision, a new rule of law here. The board is not required to address every prior decision that addresses a similar legal issue, and it is factually distinguishable for the reasons I stated. But we're being asked really to read the agency's mind, the NLRB's mind, about why it thought it was distinguishable. Well, I don't think it doesn't have to distinguish. I mean, if a case were obvious in terms of having nothing to do with it, obviously it wouldn't have to talk about it. But it's a little hard for me to see why Milwaukee Spring doesn't have some application here, and ought to at least be given consideration. Well, there are a number of prior cases that deal with this midterm modification theory, and the board does not... The board didn't talk about any of them. The board did talk about some of them, Chesapeake Plywood, I believe it cites, for example. And so Milwaukee Spring is one of a number of those cases. It doesn't involve the situation we have here, where there's two collective bargaining agreements that govern labor relations at the Memphis plant. And that is the reason, as I believe was discussed earlier, why this has been called an effective modification, because there are these two contracts, both of which are in effect. Milwaukee Spring doesn't have anything like that. And it's also the factual distinction that the employees who were now going to be doing this work were not subject to the same contract. So the board is not overruling Milwaukee Spring, it just claims it's not applicable in this case. Right, there's no... Right. It's not required... You recognize that as valid precedent in other cases, but not... Right. Okay. Right. Yes. And so I'd like to focus the court's attention on the idea that the modification here that the board found was as to the terms and conditions of employment for regular employees. So the question of whether, as a general matter, terms for... Was it really worried about regular employees, or was it worried about... Because it seems to me like an awful lot of what you've been saying refers to new employees who wouldn't be either one until they were actually hired, and that Kellogg would like to bring at least a greater percentage of new hires in as casual rather than regular, but they're not regular yet. You're correct. The modification is as to new employees. For them, they are being brought in. The entire complement of new employees are doing the work of regulars but are being paid as casuals. And so the board does say several times that it's as to new employees that there's been a modification. And the board has found in the past that a modification is no less of a modification just because there are some other employees that are still receiving the contractual terms. That was in the Martin Marietta case that this court enforced. And so the idea that there are still some regular employees at the plant, what Kellogg deemed legacy employees, does not change the analysis here. It's as to the new and returning employees, such as the laid-off regulars who could be brought back as casual. As to them, the contract has been modified. What Kellogg's proposal does here is for new employees, creates a one-tier system in which it collapses the distinctions between regular and casual employees. These are employees regular in all but name, and yet receive different terms and conditions of employment that are set forth in the master agreement. That agreement has been modified, and that is why the board found a violation. I see my time is up. Thank you, Counsel. Thank you. First, as to the definition of casual employees in the ordinary definition, the party's past practice has applied to the other local facilities, make clear, and in Memphis that it is not the ordinary definition that controls. And second, even if there is this restriction in the master, even if you assume there are some restrictions on Kellogg's ability to use casuals, Kellogg's last best offer incorporates those restrictions into the substance of its terms. Let me quote Joint Appendix, page 492. This is the actual term being proposed in the last best offer. It says, quote, There shall be no restrictions on Kellogg's right to hire, use, manage, or direct casual employees. And you hear the board in the union amplify that time and time again. And then it states, except as specifically set forth in any provisions of an applicable master agreement. So if the board can imply these terms in, if it can say by using the word casual it has its ordinary definition and somehow that's a restriction, we don't agree with that at all. But even if it does, the board's finding is a logical, factual, and legal impossibility. Kellogg has made that argument repeatedly as an affirmative defense. You won't find it addressed in the board's decision. It's ignored. But you can't escape that as a matter of contract interpretation. And on a matter of contract interpretation, you owe the board no deference. Extreme proposals is what the general counsel said. What does that go to? The substance of the proposals. That's exactly what the board didn't like here. They didn't like the lockout. They didn't like the substance of the proposals. But that's not their role. Their role here is to look at the party's contract. And where we get confused on is what is not unambiguous is how the parties in the master defined where things should be bargained. The parties said that the only things that we bargained in the master are those things covered in the master, and they used this language. This is the language. This agreement shall cover only those matters specifically included herein. Only and specifically exacting language. That is the only thing as a matter of contract that can be bargained at the master level. Everything else is a matter of law because the local union is a Section 9A representative that has an obligation to bargain over all mandatory topics at the local level, at the Memphis level. Thank you, counsel. Yes, go ahead. Thank you for your time. Case will be submitted. Clerk may call the roll.